PARROT JUNGLE, INC., A CORP. OF the STATE OF FLORIDA, Plaintiff,

v.

PARROT JUNGLE, INC., A CORP. OF the STATE OF NEW YORK, and Steven Kates, Defendants.

81 Civ. 100.

United States District Court,
S. D. New York.

April 15, 1981.

Jack E. Dominik, P. A., Miami, Fla., (Robert S. Levy, New York City, of counsel), for plaintiff.

Bertram Frank, P. C., New York City, (Jeff Greenman and Vincent M. Fazzari, New York City, of counsel), for defendants.

## OPINION

OWEN, District Judge.

Plaintiff Parrot Jungle, Inc. ("Parrot-Miami") moves this court for an order pursuant to Fed.R.Civ.P. 65 preliminarily enjoining defendants Parrot Jungle, Inc. ("Parrot-New York") and its president, Steven Kates, from using the name "Parrot Jungle." Plaintiffs allege that such use constitutes a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits, *inter alia*, the use of a false designation of origin of goods or services in commerce.

In two days of testimony and argument at the preliminary injunction hearing, the following emerged: Parrot-Miami owns a tourist attraction in Miami, Florida called Parrot Jungle, which was created in 1936 by one Franz Scherr, the father of plaintiff's current president, Jerome Scherr. It is situated on twelve acres of lush-foliaged land and features parrots and other birds, uncaged and in a natural habitat, much like a jungle. Parrot Jungle in Miami is a nationally-known enterprise, which each year attracts some 400,000 visitors who pay five dollars per adult admission to view the birds and grounds and to watch a show of trained parrots. Plaintiff's gross revenues from its operations amounted to $3.2 million in 1980.

Defendant ("Parrot-New York"), using the identical name, Parrot Jungle, Inc., commenced operations in 1977 in a store in Brooklyn. Its president and owner is defendant Steven Kates. Parrot-New York, a New York corporation, offers expensive parrots for sale at retail outlets. Kates, who has a considerable background in birds,[1] testified that he was "obviously aware" of Parrot-Miami when he selected a name for his operation since he had visited

---

1. Kates graduated from Cornell University in 1974 with a Bachelor of Science degree in pre-veterinary medicine and animal science. He subsequently attended the University of Bologna, Italy Veterinary College for three years, although he left in 1977 before earning his graduate degree.

the Miami attraction in 1972 and again in 1974.[2] Kates insisted, however, that he chose the name "Parrot Jungle" for his New York store because customers at a friend's exotic plant store at which he earlier had displayed his uncaged birds frequently commented that the store looked and sounded like a jungle. Kates said that when he opened his own store, he merely combined those comments with the product he was selling to arrive at the name. Defendants' stores today do display the birds perched freely on simulated tree branches against a background of jungle-like wallpaper.

In 1978 Kates opened additional retail parrot stores, one in Paramus, New Jersey, one in Manhattan, and two, which failed, on Long Island. Plaintiff's president, Jerome Scherr, concedes that by very early 1979 he was aware that perhaps three stores in the New York area were using plaintiff's name, but he took no action because he regarded the stores as nothing "more than pet shops" which "come and go." In August 1980, however, Scherr heard that Parrot-New York was embarking upon further expansion, and in October he learned from an interview show aired on national television and an article in a magazine that Parrot-New York had begun a national franchising program. This discovery immediately prompted Scherr to contact counsel and retain a trademark specialist. By that time, however, defendants had franchised their first three stores, one in Westbury (Long Island), one in Scarsdale, New York, and one in Stamford, Connecticut.

■ In assessing plaintiff's claim under § 43(a) of the Lanham Act, I turn first to an analysis of plaintiff's trademark to determine the scope of protection to which that mark is entitled. The cases interpret the Lanham Act as identifying four categories of trademarks, each with its own degree of protection against infringement. In ascending order of strength, the four cate-

gories are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979). It should be noted that to some extent, the categories and the legal principles which they embody have "become lost in a welter of adjectives." *Abercrombie & Fitch Company v. Hunting World, Incorporated*, 537 F.2d 4, 9 (2d Cir. 1976). Applying the teaching of *McGregor, supra,* I conclude on the record before me that the name "Parrot Jungle" is in the area of descriptive or suggestive. It is not generic or arbitrary or fanciful. *See generally* 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 71, at 115–196 (3d ed. 1969).

■ Further guidance in the suggestive-descriptive area may be found in *Stix Products, Inc. v. United Merchants and Manufacturers Inc.*, 295 F.Supp. 479 (S.D.N.Y. 1968), where the court stated at page 488:

A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

Keeping these guidelines in mind, I conclude, that plaintiff's mark belongs properly in the descriptive category.[3] As a descriptive mark, it is entitled to protection against infringement by an identical name if its senior user can demonstrate (1) a likelihood that an appreciable number of ordinarily prudent consumers are likely to be confused as to the source of goods and services defendants offer for sale, *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1132, and (2) that its mark has obtained "secondary meaning" in its market, i. e., that the consuming public has come to associate the name "Parrot Jungle" with plaintiff's attraction in Miami. *W. E. Basset Company v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970).

---

**2.** The second visit was for several days during which Kates, assisted by Parrot-Miami's general manager, tested a theory he had developed while a student for determining the gender of birds.

**3.** Interestingly but of no relevance to this proceeding, the mark as used by the defendant is probably in the suggestive category.

In reaching a determination on the secondary meaning issue, the court will consider, among other factors, (1) the duration of plaintiff's exclusive use of its mark, (2) the nature and extent of plaintiff's advertising and promotion of its mark, (3) the extent to which plaintiff's business has, other than by its own efforts, come to the attention of the consuming public, (4) plaintiff's patronage record, and (5) defendants' conscious copying of plaintiff's mark. *E. g., Harlequin Enterprises Limited v. Gulf & Western Corporation*, 503 F.Supp. 647, 650 (S.D.N.Y.1980), *aff'd*, 644 F.2d 946 (2d Cir. 1981); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979); *see generally* 3 Callman, *supra*, § 77.1.

Examining these factors, I find that plaintiff has used its mark continuously and exclusively for more than forty years. Plaintiff advertises modestly but extensively, primarily by providing brochures to travel agencies and tour groups worldwide which have booked tours to Parrot-Miami. Its advertising expenditures in 1980 neared $60,000 and, since 1957, have totalled almost $600,000. Plaintiff widely promotes its Florida attraction, most notably by permitting various companies, such as Eastman Kodak and Union Carbide, to use photographs of plaintiff's establishment in their advertising and also by travel promotions and advertising sponsored by several airlines, including Eastern, National, and Pan Am. This latter advertising has appeared in such major national publications as Time, Newsweek, U.S. News and World Report, and Sports Illustrated. In addition, plaintiff, through the Florida Department of Commerce, distributes a twenty-eight minute film about The Parrot Jungle in Miami which has been screened for a number of years throughout the country on television, in school classrooms, and on airplanes. Apparently more than forty million persons have seen this film. Parrot-Miami has also been the subject of scores of articles in publications around the country and the world, among them, Life, National Geographic, The Chicago Tribune, The Satur-

day Evening Post, the Detroit News, the Miami Herald, This Week (the weekly magazine of the now-defunct New York Herald Tribune), and the Toronto Star. The promotion and advertising apparently has been successful; the number of visitors to the attraction has grown steadily since 1936 to approximately 400,000 in 1980.

I also find on the record of this hearing that, when he named his business, defendant Steven Kates deliberately copied plaintiff's mark to take advantage of plaintiff's good will and reputation. Kates admitted that, prior to starting to use the name "Parrot Jungle," he had twice been to the Miami attraction and therefore knew its name.[4]

Kates's state of mind is further evidenced by the fact that he must have told his lawyer during preparation for the hearing that plaintiff had granted him permission to use the name, for prior to the hearing his lawyer told the court the following:

> Mr. Kates visited Parrot Jungle, Inc. in Florida in 1977, and thereafter told Mr. Scherr and a Mr. Springer, who at the time was a trainer at the amusement park, that he had opened a store in New York to sell birds and that he was going to use the name Parrot Jungle, Inc. in connection with his retail activities.

> Mr. Scherr said nothing. As a matter of fact, he wished him good luck and made no objection to his use of the name.

Kates later testified before me, however, to having had only two conversations with Mr. Scherr, neither of which related to this crucial subject. The fact that this alleged conversation, first recited to the lawyer, was not later supported under oath strongly suggests that Kates approached the hearing aware that he had made a mistake in copying plaintiff's name and was groping for an explanation. There is no question that even in 1977 Kates was aware of the existence of a problem, for he acknowledges conferring with a lawyer about the propriety of using plaintiff's name before he adopted it for his own business. And final-

---

**4.** On the second visit, he conferred at length with the general manager, *see* note 2, *supra*.

ly, the acknowledgements in Kates's book, "Encyclopedia of Cockatoos", are expressed in such a way that a reader might be led to conclude that Parrot-Miami assisted Kates in preparing the book.[5]

The foregoing constitutes abundant evidence that defendants intentionally imitated plaintiff's mark. Deliberate copying, of course, is persuasive evidence that plaintiff has succeeded in creating consumer recognition and good will for its service business. *RJR Foods, Inc. v. White Rock Corp., supra*, 603 F.2d at 1060; *Socony-Vacuum Oil Co., Inc. v. Rosen*, 108 F.2d 632, 636 (6th Cir. 1940). Thus, from this evidence of intentional copying, combined with the other factors discussed above, I conclude for purposes of a preliminary injunction that plaintiff's mark has achieved secondary meaning.

Next to be determined is whether there is a likelihood that the relevant public is likely to confuse Parrot-New York with Parrot-Miami. The principal factors to consider on this issue include intentional copying and secondary meaning, already determined, as well as the "proximity" of plaintiff's and defendants' businesses. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, 599 F.2d at 1130. First, defendants' deliberate use of plaintiff's exact name unquestionably gives rise to a legal presumption that the similarity will cause consumer confusion. *RJR Foods, Inc. v. White Rock Corp., supra*, 603 F.2d at 1060; *Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc.*, 281 F.2d 755, 760 (2d Cir. 1960) *quoting My-T-Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2d Cir. 1934). In addition, the fact that plaintiff's

mark has secondary meaning enhances its strength and thus the probability of confusion. And finally, the proximity of the two businesses is undisputed; each party displays tropical birds, the plaintiff for viewing and the defendants for sale. Thus, for purposes of this preliminary injunction, plaintiff has sufficiently demonstrated its claim of trademark infringement under § 43(a) of the Lanham Act.

Defendants contend, however, that in any event, relief to the plaintiff is barred by laches, because after plaintiff first learned of defendants' use of its name it delayed unreasonably in bringing this action. In my view, however, there is a substantial difference between plaintiff's awareness of a pet store or stores in New York and its awareness of a national franchising effort. It was the latter which triggered plaintiff's prompt assertion of its rights. A modest encroachment is one thing, a sudden proposed national exploitation of plaintiff's name is quite another, and plaintiff's failure to challenge the former will not entirely disable plaintiffs from preventing the latter. *See Miss Universe, Inc. v. Patricelli*, 271 F.Supp. 104, 110 (D.C. Conn.), *aff'd*, 386 F.2d 997 (2d Cir. 1967).

Finally, I note that among the legitimate interests the senior user of a mark is entitled to protect are (1) its right to expand into an obviously related field in which an infringer is operating and (2) its right to run and develop its business free from damage to its reputation by the potentially improper practices of an infringer not under its control.[6] *Avon Shoe Co. v. David*

---

5. Of some significance is the fact that among the illustrations in Kates's Encyclopedia is the very photograph which plaintiff Parrot Jungle-Miami has used for years as its logo. The words "Parrot Jungle Miami" have been amateurishly obliterated on it. One Herbert Axelrod is credited with being the photographer. Axelrod, it turns out, is the editor of the book and he and Kates worked together closely in assembling it. Axelrod testified before me on behalf of Kates and gave a flustered and implausible explanation when confronted with the use of the doctored logo. I find his explanation to be false and revealing of not only his but, more important, Kates's cavalier attitude to-

ward the property of Parrot-Jungle Miami. I do, however, credit a statement of Axelrod's going to the "secondary meaning" issue in this case:

> Q. [by counsel for defendants] Have you discussed Parrot Jungle in Miami with anyone associated with your industry?
> A. Yes. Parrot Jungle is [a] very famous, very successful, lovely establishment and it is a tourist attraction. It is mentioned in books and it is a great place. We all talk about it.

6. According to the testimony of two of Kates's franchisees, Di Jennaro and Schweitzer, Kates was somewhat less than exemplary in his deal-

*Crystal, Inc.*, 279 F.2d 607, 613 (2d Cir.), *cert. denied*, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). Both of these rights are entitled to protection here.

■ Given the record before me I conclude that plaintiff has met its burden of demonstrating (1) that defendants' planned expansion of their use of the name "Parrot Jungle" will, in all reasonable probability, cause plaintiff to suffer irreparable harm and (2) that plaintiff is likely to succeed on the merits of its claim. *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979).

Plaintiff's motion for a preliminary injunction is therefore granted to the following extent: defendants Parrot Jungle, Inc. and Steven Kates and anyone acting in concert or association with them are hereby preliminarily enjoined from establishing any new stores, whether by franchise or some other method, using the name "Parrot Jungle". All other requested relief is, at this time denied.

Settle Order on reasonable notice.

ings with them. He has also had his problems with the New Jersey Division of Fish, Game & Wildlife, at one point paying a $500 fine for a violation of New Jersey's regulations governing the keeping of exotic species.