The WESTWARD COMPANY, a Michigan corporation, Plaintiff,

v.

GEM PRODUCTS, INC., a California corporation, Defendant.

Civ. A. No. 82–71509.

United States District Court, E.D. Michigan, S.D.

July 18, 1983.

William Schramm, Mount Clemens, Mich., for plaintiff.

Thomas N. Young, Troy, Mich., Donald M. Cislo, Santa Monica, Cal., for defendant.

## OPINION

FEIKENS, Chief Judge.

This declaratory judgment complaint asks that the sale of certain products be declared to not infringe on any of defendant's rights with respect to trade dress or product designators. Defendant counterclaims alleging that plaintiff's trade dress and use of certain product designators constitute trademark infringement under the Lanham Act, 15 U.S.C. §§ 1125 and 1126, common law unfair competition, and copyright infringement * under 17 U.S.C. § 101 et seq. De-

\* The copyright matter was not pursued at trial.

fendant seeks injunctive relief and damages for the above alleged infringements.

Jurisdiction for this action lies under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., as well as under the Lanham Act, 15 U.S.C. § 1121.

## I. BACKGROUND

Plaintiff, the Westward Company ("Westward"), is a corporation organized and operating under the law of Michigan and has its principal place of business in Troy, Michigan. Westward was founded in 1928, and since that time has principally been engaged in the manufacture and sale of replacement parts for electrical appliances. These parts are intended to replace the original equipment manufacturer's ("OEM") parts used in appliances produced by various appliance manufacturers. Such parts are intended to be somewhat general in application, as opposed to the specific application of the OEM parts. In other words, a given replacement part, such as an evaporator motor, can be used to replace similar motors used in a number of name-brand appliances. Retailers of these replacement parts use cross-index tables and microfiche from various sources to determine which replacement parts are suitable for substitution for specific OEM parts.

Defendant, Gem Products, Inc. ("Gem"), is a corporation having its principal place of business in the state of California, and is also engaged in the manufacture and supply of appliance replacement parts. In marketing its products, Gem originated and introduced a product designator system which serves to identify its various product lines and individual products. This system generally employs alphanumeric designators which have a letter prefix, which identifies the general product type, followed by a number, which identifies the specific product within that type. Examples of such designators are: EM–319 (an evaporator motor of a certain type); D–109 (a specific dryer); FB–108 (a specific fan blade); GH–203 (a specific heater); and GL–45 (a specific thermostat).

These Gem-originated designators are well known in the industry, and for that reason a number of Gem's competitors use the Gem designators as reference numbers on their packages. Other Gem competitors have adopted designators that are similar to those used by Gem. For example, P.G. Assco designates its equivalent to a Gem GL–45 thermostat as a PL–45, and Sealed Unit designates its equivalent to a GH–261 heater as SH–261. In fact Westward itself used this technique at one time in designating its equivalent to a GL–45 thermostat as a WL–45.

Traditionally Westward has concentrated primarily on the supply of replacement parts in the laundry market (*i.e.,* parts for washers and dryers); however, sometime in 1974 Westward elected to expand its product line into the area of refrigerator replacement parts, a market in which Gem was already actively competing. In order to facilitate this expansion, in 1981 Westward adopted the Gem-originated designator system and used it to identify 135 Westward products. Prior to this time, Westward employed an IBM five-digit numbering system (*i.e.,* 72,000) as the primary designators for its products, and used the Gem-originated numbers only as reference numbers. According to Westward, it adopted the Gem designators because they were the designators used by the market as a whole, and connoted only the type or part, and not its origin or producer.

Gem objected to Westward's use of the Gem-originated designators claiming that such designators were common law trademarks for Gem's various products. Gem also objected to Westward's use of trade dress in the marketing of its products. Specifically, Gem claimed that Westward's use of the trade name "Keyline" was an imitation of Gem's trade name "Gemline"; that Westward's logo was an imitation of Gem's; and that the label on Westward's boxes, in configuration and content, was an imitation of Gem's label. Gem made these objections known to Westward, and in response, Westward brought this declaratory judgment action.

## II.  DISCUSSION

Gem alleges that Westward's actions constitute violation of the Lanham Act, 15 U.S.C. §§ 1125 and 1126, as well as common law unfair competition under Michigan law. Westward correctly argues that these are separate issues, and that the law of Michigan should apply to the common law unfair competition claim. However, the United States Court of Appeals for the Sixth Circuit recently decided a case in which violations of both the Lanham Act and common law unfair competition under Michigan's law were alleged, and the Court found that the test under both claims was the same—a likelihood of confusion. *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831 (6th Cir.1983).

### A.  The Law

The law in the various Circuits with regard to the scope and parameters of actions under the Lanham Act, primarily 15 U.S.C. § 1125(a), is somewhat confused. However, the Sixth Circuit has recently had an opportunity to examine this Act, and has set forth its parameters in clear fashion. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642 (6th Cir. 1982).

The relevant portion of the Lanham Act provides, *inter alia,*

> Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). The intent of the Lanham Act is set forth in 15 U.S.C. § 1127, which provides:

> The intent of this chapter is to regulate commerce within the control of Congress

by making actionable the deceptive and misleading use of marks in such commerce ... [and] to protect persons engaged in such commerce against unfair competition ....

The terms "mark" and "trademark" are defined by the foregoing section as follows:

The term "mark" includes any trademark, service mark, collective mark, or certification mark entitled to registration under this chapter whether registered or not.

The term "trade-mark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

■ In *Frisch's Restaurants,* the Sixth Circuit acknowledged that the Lanham Act may be construed as creating a *sui generis* federal statutory cause of action for false representation and unfair competition. *Id.* at 646. In fact, Callmann's treatise on unfair competition and trademarks so states:

However, it is now established that an action under section [1125(a)] is directed against a new federal statutory tort "sui generis" which is within federal jurisdiction. (Footnote omitted) Under the proper interpretation of section [1125(a)], an action for unfair competition based upon infringement can now be brought in federal court.

I R. Callmann, Unfair Competition Trademarks and Monopolies § 207 (4th ed. 1981). Thus, actions under § 1125 can be viewed as federal unfair competition claims. It has also been held in this Circuit that false representation about the origin of source or manufacture by use of trade dress or otherwise is prohibited by the "false designation of origin" clause of § 1125(a), *Federal-Mogul-Bower Bearings, Inc. v. Azoff,* 313 F.2d 405, 408 (6th Cir.1963). Thus, it is clear that Gem's claims in the instant case are properly grounded under § 1125(a). It is further recognized that a trademark or other indicia of origin need not be registered in order for § 1125 to apply. *Warner Brothers, Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981).

As to the standard of proof needed to prevail in an action under § 1125(a), the Court in *Frisch's Restaurants* stated that proof of actual deception must be shown in order to recover damages, but only a likelihood of confusion or deception need be shown in order for equitable relief to be granted, *supra,* at 647. In the case at hand, while Gem nominally requested money damages, it made no attempt to demonstrate such damages, and was obviously concerned primarily, if not exclusively, with obtaining equitable relief for which only a likelihood of confusion need be proved.

■ In cases brought under the Lanham Act, the burden is on plaintiff (in this case, nominally the defendant) to establish by a preponderance of the evidence the likelihood of confusion. *Aloe Creme Laboratories, Inc. v. Estee Lauder, Inc.,* 533 F.2d 256 (5th Cir.1976). This Circuit has held that such likelihood of confusion need not arise from intentional conduct, and that a tendency to create a false impression is sufficient to warrant injunctive relief. *Frisch's Restaurants* at 647.

■ Since the central inquiry here is one of determining whether there is a likelihood of confusion, we must again look to *Frisch's Restaurants* to determine the factors to examine in reaching that determination. The Court in *Frisch's Restaurants* adopted the eight-factor approach to this inquiry put forth by the Ninth Circuit in *Toho Co., Ltd. v. Sears Roebuck & Co.,* 645 F.2d 788 (9th Cir.1981). These factors are:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product lines.

*Frisch's Restaurants* at 648. It is by reference to these factors that the determination in this case as to likelihood of confusion must be made.

### B. *Likelihood of Confusion*

■ In their presentation of the case, the parties, for whatever reasons, chose to treat the use of the Gem-originated designators and the trade dress issue as completely separate matters. However, under the Lanham Act this is not the case. The Act, by its terms, provides relief for the use of "words or other symbols" which tend to falsely represent origin. 15 U.S.C. § 1125(a). In this Circuit it has been held that it is the totality of such words or symbols which must be looked at in order to determine whether confusion is likely. *Chesebrough Mfg. Co. v. Old Gold Chemical Co., Inc.,* 70 F.2d 383 (6th Cir.1934). Thus, it is the totality of the package along with its label and markings (including an alphanumeric designator) which must be scrutinized; they are not discrete issues. However, because the evidence lends itself to such an analysis, I will analyze the use of designators and trade dress separately, and then assess their mutual impact in order to decide the issue of likelihood of confusion.

### 1. *Use of Designators*

Westward began using 135 Gem-originated designators in 1981 on Westward products. In defending the use of such designators, Westward argues that there can be no protectible interest in alphanumeric designators of this sort, citing several early Sixth Circuit cases. *Deering Harvester Co. v. Whitman & Barnes Mfg. Co.,* 91 F. 376 (6th Cir.1898); *Dennison Mfg. Co. v. Scharf Tag, Label & Box Co.,* 135 F. 625 (6th Cir.1905). Aside from the vintage of these cases, they are not controlling here for two reasons. First, they deal only with designators for which no secondary meaning has been shown. *See Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018 (7th Cir.1979), which states that these Sixth Circuit cases can be distinguished on that ground. Second, the above cited Sixth Circuit cases dealt with common law trade-

marks, and not with violations of § 1125(a) of the Lanham Act. As has already been noted, § 1125 proscribes the use of any "words or other symbols" which tend to deceive. Alphanumeric designators are obviously words or symbols and are thus in no way excluded from protection under the Act.

The inquiry with respect to such designators is solely one of whether Westward's use of them is likely to cause confusion. I must apply eight factors in *Frisch's Restaurants* to determine whether such confusion exists. The first of those factors is strength of the mark, which refers to the degree of identification that the mark in question has with the complaining party's goods. *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir.1979). Courts have taken different approaches to this inquiry. Some courts have used a four-category hierarchy to establish the strength of marks. Under this system, marks are designated as:

1. generic (*i.e.,* the common name of the object in question);

2. descriptive (*i.e.,* describing the object in question);

3. suggestive (*i.e.,* tending to suggest the nature of the object in question); and

4. arbitrary or fanciful (*i.e.,* having nothing to do with the object).

*McGregor-Doniger, id.; Keebler Co. v. Rovira Biscuit Co.,* 624 F.2d 366 (1st Cir.1980). Within this hierarchy, generic marks are accorded the least strength and arbitrary marks the most. With regard to the intermediary categories, descriptive and suggestive terms are attributed an intermediate degree of strength, and will normally only be accorded protection after it has been established that there is a secondary meaning associated with them; that is, that they have become associated with their producer in the eyes of the consumers. *Id.*

The Sixth Circuit has not considered this issue in great depth. However, in *Hindu Incense v. Meadows,* 692 F.2d 1048, 1049 (6th Cir.1982), the Court recently discussed

the degree of protection to be accorded different marks. The Court employed a two-category test, using "strong and weak" categories, and holding that weak marks are only entitled to protection upon a showing of a secondary meaning. *Id.* at 1050. In any event, the threshold issue is one of deciding whether alphanumeric designators are a strong type mark which need nothing more in order to merit protection, or a weak mark for which secondary meaning must be shown.

Looking at the four-category test for guidance, one might intuitively assume that alphanumeric designators are the strongest type of mark in that they are basically arbitrary or fanciful, and bear little or no connection to the product which they designate. However, courts which have looked at this question have generally found that such designators are inherently weak, and that secondary meaning must be demonstrated before protection will be accorded. *K–S–H Plastics, Inc. v. Carolite, Inc.,* 408 F.2d 54 (9th Cir.1969); *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018 (7th Cir.1979). *See also* Annot., 56 A.L.R.Fed. 232 (1982). In deciding whether such marks are strong (arbitrary or fanciful) or weak (descriptive), the Court in *Ideal Industries* stated:

> The [alphanumeric designators] are not "arbitrary" marks in the trademark sense. Although the numbers were chosen arbitrarily in the sense that they do not refer directly to a characteristic of the connectors, the progression of numbers was adopted, and is currently used, to describe [the product]. Hence, they are merely descriptive, not arbitrary, terms.

*Id.* at 1023.

Such a rule will be applied in the case at hand. I must therefore decide whether the product designators in question have attained a secondary meaning. The Sixth Circuit has held that a secondary meaning attaches to a mark when it is

> associated in the minds of prospective customers with the source from which the article came to such an extent that de-

mand for the particular article depends upon the business reputation or standing of its maker.

*American Fork & Hoe Co. v. Stampit Corp.,* 125 F.2d 472, 475 (6th Cir.1942); *cited with approval* in *West Point Manufacturing Co. v. Detroit Stamping Co.,* 222 F.2d 581, 593 (6th Cir.1955). Courts have identified a number of factors which are demonstrative of secondary meaning. Examples of such factors are:

> (1) the duration of plaintiff's exclusive use of its mark, (2) the nature and extent of plaintiff's advertising and promotion of its mark, (3) the extent to which plaintiff's business has, other than by its own efforts, come to the attention of the consuming public, (4) plaintiff's patronage record, and (5) defendants' conscious copying of plaintiff's mark.

*Parrot Jungle, Inc. v. Parrot Jungle, Inc. et al.,* 512 F.Supp. 266 (S.D.N.Y.1981). It has also been stated that the existence of secondary meaning can be inferred from the mere fact that a business competitor has consciously imitated a nonfunctional design feature or trademark. *Faberge, Inc. v. Saxony Products, Inc.,* 605 F.2d 426 (9th Cir.1979); *Midway Mfg. Co. v. Dirkschneider,* 543 F.Supp. 466 (D.Neb.1981).

In this case there is more than ample evidence of secondary meaning to justify according protection to Gem's designators. Westward presented a number of witnesses who, on direct examination or by stipulation, testified to the fact that, in their mental impressions, the designators did not connote origin of the product, but only served to identify the product itself. However, on vigorous cross examination, virtually all of the witnesses admitted that, prior to 1981, they knew that the designators at issue identified products made by Gem. Westward argues that, now that Westward has appropriated Gem's designators, such designators can no longer serve to identify the source of the product. This is, of course, tautological, and is the precise reason why Gem is in court contesting Westward's use of the designators.

Westward also argues that the Gem-originated designators do not have secondary meaning because they are in standard, industrywide use, and are descriptive of parts manufactured by a number of producers. In support of this contention, Westward offered a number of pages of catalogs and flyers in which Gem-originated designators were used to identify certain products without reference to their source. However, Gem demonstrated that in other instances, in the same catalogs, such designators were used in conjunction with Gem's name and logo. Furthermore, Gem demonstrated that, contrary to Westward's contention, other manufacturers and suppliers of replacement parts in the industry were not widely using the Gem designators. Some manufacturers used designators similar but not identical to Gem's (*i.e.,* Sealed Unit used the designator SH–261 for a certain heater instead of the Gem-originated GH–261). Other manufacturers used a number completely different from Gem's and only used Gem's number in small print as a reference number. Westward only showed one instance where another manufacturer was directly using a Gem designator on only one product (National's use of GH–261). This is obviously an isolated instance and does not serve to demonstrate that the designators in question are in industrywide use, especially since Gem claims that National is not even one of its competitors.

In addition to the evidence of the virtual exclusive use of the disputed designators by Gem, there is additional evidence of secondary meaning. The most salient of that evidence is the existence of the Gem catalog. In that catalog Gem has an extensive cross-model reference table which lists thousands of OEM parts along with the Gem products, identified by the Gem designator, which replace them. Testimony revealed that this cross reference table is a valuable, and sometimes exclusive, means of determining an appropriate replacement part for a given OEM part. Testimony by Gem's president showed that Gem puts a great deal of effort into this catalog and cross-reference table, spending approximately $400,000 annually in producing and distributing it. Since this catalog only lists Gem replacement part designators, and since it is in such wide use in the industry, it obviously serves to advertise Gem's products and facilitate their sale. It is also obvious that if any competitor were able to appropriate the use of Gem's designators, it could effectively coat-tail on Gem's efforts and enjoy the fruits of Gem's labors. Thus I find the existence and widespread use of Gem's catalog and cross-reference table as significant in demonstrating secondary meaning.

The final indication of secondary meaning of Gem's designators was testimony by Gem's witnesses to the effect that they perceived the contested designators as identifying Gem's products. All of this evidence, taken together, leads to the clear conclusion that Gem's designators attained a high degree of secondary meaning. Thus, the first of the eight factors impacting on confusion, strength of mark, shows that Gem's marks were possessed with the requisite degree of strength.

The second, third and fifth of the factors for determining likelihood of confusion; relatedness of the goods, similarity of the marks, and the marketing channels used, all militate in favor of a finding of confusion in that the goods, the designators, and marketing channels employed by Westward were all virtually identical to Gem's.

The fourth of the factors set forth in *Frisch's Restaurants* is evidence of actual confusion. The Fifth Circuit has acknowledged that evidence of actual confusion is not necessary to a finding of likelihood of confusion, but, is nevertheless the best evidence of such a likelihood, *Amstar Co. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir. 1980), and the Sixth Circuit has adopted this reasoning. (*Frisch's Restaurants, supra,* at 648.

In this case there is clear evidence of incidences of actual confusion. The deposition testimony of Charles F. Carter, owner of a California-based appliance repair company, shows that he was confused when he tried to purchase a Gem evaporator motor,

EM–316, and received a Westward motor identified by the same designator. He said that he assumed that Westward had bought out Gem and was now selling the old Gem EM–316. He also testified that it confuses his employees who attempt to purchase parts, and that he has to carefully instruct them to make sure that they are receiving Gem parts. There was also evidence of at least one occasion in which a part with a Gem designator was returned to the wrong manufacturer for warranty work.

The next of the eight factors is the likely degree of purchaser care in selecting the product. Both Gem and Westward are wholesaler/manufacturers that sell primarily to retailers. Testimony indicated that these retail purchasers are generally quite familiar with the manufacturers they are buying from, and would probably exercise a high degree of care in their purchasing. However, the retailer's demand for Gem's products is a derived demand which comes from demands of the ultimate purchasers, normally appliance repair businesses. As far as these ultimate consumers are concerned, there is little evidence that they are careful purchasers. In fact the evidence tended to indicate that they oftentimes ask for only the part number, or give the clerk the OEM part number and accept whatever he provides as a replacement. Thus, it would seem that, as far as ultimate demand is concerned, there is not a high degree of purchaser care.

The next factor to be considered is Westward's intent in selecting the mark. The Fifth Circuit commented on the relevance of such intent, stating:

> The intent of defendants in adopting [their mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff] that fact alone "may be sufficient to justify the inference that there is confusing similarity."

*Amstar Co. v. Domino's Pizza, Inc., supra,* at 263. This factor again clearly militates in favor of a finding of a likelihood of confusion. Westward did not select the designators in question because they were obvious or because they naturally lent themselves to use on products of this sort. It was not by coincidence that Westward selected the designators. By its own admission, Westward selected the use of the Gem-originated designators because of the fact that they had an established meaning in the relevant market.

■ The final of the eight factors in this inquiry is the likelihood of the expansion of the product lines. This factor is relevant because courts will provide greater protection in cases where there is a possibility that the alleged infringer will expand its business to directly compete with a trademark holder rather than in cases where the possibility of such direct competition does not exist. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979). In this case there is already a direct competition involving the disputed designators. Given the fact that the full extent of such competition already exists, this factor, too, militates in favor of a finding of the likelihood of confusion.

#### 2. Trade Dress

In addition to the complaints involving product designators, Gem also claims that confusion results from Westward's use of certain elements of trade dress. First, Gem argues that Westward's use of the trademark "Keyline" is an imitation of Gem's trademark, "Gemline," and is likely to cause confusion. Gem also claims that Westward's use of a blue, downward-pointing arrowlike design as a logo can be confused with Gem's use of a red chevron. Finally, Gem argues that Westward's placement of its labels and the information thereon, along with the shape of Westward's boxes, is an imitation of the packaging used by Gem, and is likely to lead to confusion.

With respect to claims for trade dress infringement, the Sixth Circuit has stated:

> Stimulation amounting to unfair competition does not reside in identity of single features of dress or markings nor in indistinguishability when the articles are set side by side, but is to be tested by the general impression made by the offend-

ing article upon the eye of the ordinary purchaser or user. If the general impression which it makes when seen alone is such as is likely to lead the ordinary purchaser to believe it to be the original article, there is an unlawful simulation. *Chesebrough Mfg. Co. v. Old Gold Chemical Co., Inc., supra,* at 384. This Circuit has also held that an infringer cannot avoid liability by merely affixing his own name to an otherwise copied label. *Tas–T–Nut Co. v. Variety Nut & Date Co.,* 245 F.2d 3 (6th Cir.1957).

In light of this case law, analysis must now turn to applying the eight *Frisch's Restaurants* factors to the trade dress issue. In the case of the bulk of these factors there is no need to go through detailed analysis since the identical considerations which were discussed in the analysis of alphanumeric designators are present here. The only factors that need be analyzed again with reference to trade dress are strength of the mark and similarity of the marks in question.

In determining the relative strength of a particular trade dress the threshold question is, again, whether secondary meaning must be shown. As was discussed above, secondary meaning must be shown only in the case of weak marks that are descriptive, rather than strong marks that are arbitrary and fanciful. *Hindu Incense, supra.* The Fifth Circuit recently addressed the discrete issue of whether secondary meaning must be shown in order for trade dress to be accorded protection. In deciding that secondary meaning need not be shown, the Court stated:

> [T]rademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive of itself to identify the producer.
>
> The same principles should apply to protection of trade dresses. If the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging, there is

no reason to require a plaintiff to show consumer connotations associated with such arbitrarily selected features. As the Second Circuit Court of Appeals explained in *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952–53 (2d Cir.1980), applying New York law, the number of nonfunctional words and symbols available for use by later comers in the marketing of their products is unlimited. Similarly, the possible varieties of advertising display and packaging are virtually endless. The principal question, therefore, is whether or not the public is likely to be confused, rather than whether the first comer's trade dress has acquired secondary meaning.

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 702–703 (5th Cir.1981). This approach to trade dress is compelling and will be applied here. Therefore, arbitrary and nonfunctional trade dress will presume to be a strong mark, and secondary meaning need not be shown. With respect to trade dress that is functional in nature, the law of this Circuit provides that it is not subject to trademark protection and is free for use by all. *Price Food Co., Inc. v. Good Foods, Inc.,* 400 F.2d 662 (6th Cir.1968).

The only other factor which requires consideration with regard to trade dress is similarity of marks. In the case of trade dress, unlike the issue of use of designators, it is conceded that the marks are not identical. It is merely contended that they are similar to such an extent that they are likely to cause confusion. This is, of course, something of a subjective determination and one made all the more difficult by the fact that there are 135 different products involved, each with its own box and label.

In examining the package exhibits admitted into evidence, it is apparent that, while there is a certain understandable variance from one package to the next, on the whole there are definite similarities between the trade dress used by Westward and that used by Gem. For exemplary purposes, I

will briefly discuss the common similar elements existing in the trade dress of the Gem EM–319 and the Westward EM–319. *See* Appendix. Both are packaged in boxes of similar, although not identical, size and design. Both have labels which wrap over the top of the box and down one side. The Westward label has a logo, a blue downward-pointing arrow, with the name "Keyline" on the top and bottom. The Gem label has a logo, a red chevron, with the trade name "Gemline" at the top and bottom. Both labels have the name and address of the respective manufacturer on the bottom in small print. Beyond this, both labels have identical information with identical print size and configuration.

With regard to the other 134 products, it will suffice to say that to a greater or lesser extent they share similarities in trade dress similar to those discussed above. It would not be prudent or productive to go through each of those 134 sets of products and catalog all of their similarities. All that is necessary is to note that there are potentially confusing similarities, and to determine whether such similarities, considered in conjunction with the use of identical product designators, produce a likelihood of confusion.

## III. CONCLUSION

After considering the eight factors put forth in *Frisch's Restaurants* as they apply to both the use of identical product designators and the use of similar trade dress, I must now look at the products in the aggregate[1] and determine whether there is a likelihood of confusion. In a sense, the discussion of the factors above has already answered the ultimate question. Such a likelihood of confusion does exist.

In the case of Westward's use of the Gem-originated product designators, each of the eight factors militated in favor of a finding of likelihood of confusion. In the

case of the trade dress, six of the factors were the same as those involved in the consideration of product designators, and thus apply with equal force to a finding of likelihood of confusion. The seventh factor, strength of the mark, applies with greater force in the trade dress area in that arbitrary or fanciful elements of trade dress are strong marks *per se,* and therefore do not require secondary meaning in order to merit protection. As to similarity of mark with regard to trade dress, while the trade dresses involved are not identical, they do nevertheless bear marked similarities to one another and, for that reason, may give rise to confusion. In that all of the factors point to a likelihood of confusion in both the use of designators and the use of trade dress, it is axiomatic that, in aggregate, Westward's use of Gem-originated designators and trade dress is likely, if not destined, to cause confusion, and I so find.

In a case with marked factual similarities to the case at hand, the Court of Appeals for the Seventh Circuit stated:

Looking at the facts here, we see that the marks are the same, the products are the same, the manner of use of the marks is the same, and the geographical markets overlap or are identical. As if this were not enough, there is evidence that customers are not very careful in ordering the connectors. Two witnesses stated in depositions that sometimes a customer would ask for connectors by the [alphanumeric] number alone, without mentioning a producer. [Defendant] disingenuously argues that these customers are merely indicating indifference as to the source of the goods. The contrary inference is more likely when one remembers that [plaintiff] has been the dominant supplier of connectors using the [alphanumeric] numbers for over thirty years. The likelihood of confusion is almost obvious, and is not reduced by [defendant's] decision to

---

1. As was discussed above, for purposes of § 1125(a), trade dress and product designators are but two parts of a greater whole (*i.e.*, any

"words or other symbols" tending to falsely describe the origin of the product).

copy [plaintiff's] color coding scheme in addition to using the [alphanumeric] series numbers.

*Ideal Industries, supra,* at 1024–25. The language of *Ideal Industries* applies *a fortiori* here. Evidence demonstrated a clear tendency toward confusion, as well as actual confusion, which stemmed from Westward's use of Gem's designators. On top of that, Westward adopted a trade dress which, to one degree or another, imitated that which was in prior use by Gem. Such mimicry on Westward's part is precisely the sort which the Lanham Act was intended to prevent. Additionally, in light of the fact that *Carson v. Here's Johnny, supra,* held that the test for unfair competition under Michigan's common law is the same likelihood of confusion test, Westward's actions also constitute acts of unfair competition under the laws of Michigan.

Even beyond the legally mandated tests applied above, the proscription of the infringing acts discussed above is supported by strong public policy. If Westward were permitted to use Gem's product designators in the fashion which they have been, it would lead to, and has led to, harmful confusion on the part of consumers who may not only purchase a product from the wrong manufacturer, but may purchase the wrong product altogether. For example, evidence adduced at trial showed that when Westward introduced an original product (a completely new evaporator motor not already introduced by Gem), Westward gave it the next unused alphanumeric designator in the Gem designator system, EM–429. However, when Gem introduced its next motor, it did not honor Westward's prior usage, and also used the designator EM–429, even though Gem's product was completely different than Westward's. Thus, the market now has two completely different products, both offered under the same EM–429 product designation. In an industry where consumers admittedly rely on product designators to a great extent, such confusion could be quite harmful. Thus, it is not only the

legalities, but the realities, of the situation which lead to the conclusion that Westward's actions must not be allowed.

## IV. REMEDY

As was stated at the onset of this opinion, while Gem nominally requested monetary relief in its pleadings, it introduced no evidence of actual damages at trial, and obviously did not pursue the awarding of such. It was also made clear that, while Gem objected to Westward's potentially confusing trade dress, it was Westward's use of Gem's designators, especially in conjunction with that trade dress, which Gem found objectional. This was demonstrated by the fact that Gem only complained of the 135 Westward products that used the Gem designators, and not other Westward products which only used certain aspects of the questioned trade dress. Therefore, in accordance with Gem's perceived wishes, and in light of the heavy reliance on product designators in the trade, I have focused on Westward's use of Gem's designators in sculpting the appropriate form and scope of relief.

Because of Westward's unfair acts of competition under Michigan law and the Lanham Act, Westward is enjoined from the future use of any Gem-originated product designator as a primary designator for any of Westward's products. Westward is further enjoined from using designators which incorporate any substantial part of a Gem-originated designator (*i.e.,* the complete alphabetic or numeric portion of a Gem designator). Westward is allowed to use Gem-originated designators as reference designators, but only when preceded by the term "reference number," "equivalent," "type," or such other terms as clearly identify it as a reference designator, and only in print size not larger than one-half that used in the primary designator.

It is acknowledged that this relief goes farther than that applicable to other competitors in this industry. However, Westward has used and benefited by Gem's de-

signators for several years, and has doubtlessly made inroads into Gem's market through the mechanism of such illicit use. It would be patently unfair to allow Westward to continue to benefit from their past wrong by simply placing a "W" in front of or after a Gem designator and continuing to use it. In commenting on the scope of relief in cases of this sort, the Sixth Circuit has stated,

> The due protection of trademark and similar rights requires that a competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves.

*Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir.1930). *See also Chevron Chemical, supra,* at 705; *Kimberly Knitwear Inc. v. Kimberly Stores, Incorporated of Michigan,* 331 F.Supp. 1339 (W.D. Mich.1971). Given that Westward will be permitted to use Gem's designators for reference purposes, the above restrictions upon Westward will cause no hardship to those who purchase Westward's products for resale or ultimate use, and will do nothing more than alleviate any continuing confusion between Westward's products and those of Gem.

This opinion in its entirety constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

An appropriate order may be submitted.

## APPENDIX

Label from Westward
EM-319

Label from Gem
EM-319