**CENTAUR COMMUNICATIONS,
LIMITED, Plaintiff,**

**v.**

**A/S/M COMMUNICATIONS,
INC., Defendant.**

**No. 86 Civ. 9587 (MP).**

United States District Court,
S.D. New York.

Jan. 20, 1987.

Mudge Rose Guthrie Alexander & Ferdon, New York City by John J. Kirby, Jr., Shelley O'Neill, for plaintiff.

Satterlee & Stephens, New York City by James F. Rittinger, for defendant.

MILTON POLLACK, Senior District Judge.

This action sought an injunction for infringement of a trademark on plaintiff's magazine entitled "Marketing Week." The case was tried to the Court at a Bench trial. The claims arise under section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), the New York G.B.L. § 349 and the common law. Jurisdiction of the Court rests on 15 U.S.C. § 1121, 28 U.S.C. § 1338(b), and principles of pendent jurisdiction. Venue was appropriately placed pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiff claims that the mark used on defendant's magazine since September 8, 1986 infringes upon the mark used continuously since 1978 on plaintiff's magazine. An injunction was demanded; damages were waived. Findings of fact have been made and the court has concluded that a permanent injunction should be granted herein. This Opinion accompanies that Decision.

### I. Lanham Act Claim

Section 43(a) of the Lanham Act proscribes the use of a mark which creates confusion as to the origin or source of goods in commerce:

> Any person who shall affix, apply, or annex, or use in connection with any goods and services ... a false designation of origin, or any false designation or representation ... and shall cause such goods or services to enter commerce ... shall be liable in a civil action ... by any person who believes that he is likely to

be damaged by the use of any such false designation or representation.

15 U.S.C. § 1125(a)

■ It is undisputed that the mark at issue, "Marketing Week," is descriptive. Under section 43(a) of the Lanham Act, a senior user of an unregistered descriptive mark is entitled to relief if the senior user demonstrates (1) that its mark has obtained secondary meaning; and (2) the likelihood that an appreciable number of ordinarily prudent consumers will be misled or confused as to the source of the goods in question. *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 213, 216 (2d Cir.1985); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 451 (S.D. N.Y.1982); *Parrot Jungle, Inc. v. Parrot Jungle, Inc.*, 512 F.Supp. 266, 268 (S.D.N. Y.1981).

### A. *Secondary Meaning*

■ Secondary meaning is established when "the purchasing public has come to associate the name with goods from a particular source." *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 447 (S.D.N.Y.1982), quoting *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1059 (2d Cir.1979).

■ "Whether or not a symbol has acquired secondary meaning is a question of *fact*." 1 J. McCarthy, *Trademarks and Unfair Competition*, § 15.10 at 683 (2d ed. 1984) (emphasis in original); 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies*, § 19.27 at 89, 91–92 (4th ed. 1986). Plaintiff bears the vigorous evidentiary burden of proving by a preponderance of the evidence that his mark had acquired secondary meaning at the time defendant began his allegedly infringing activities. *See Thompson Medical Co.*, 753 F.2d at 217; *20th Century Wear v. Sanmark-Stardust, Inc.*, 747 F.2d 81, 90 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985).

"Since the existence of secondary meaning is a factual question, there can be no abstract test, quantitative or qualitative to determine what level of consumer associa-

tion is sufficient." *American Assn. For Adv. of Science v. Hearst Corp.*, 498 F.Supp. 244, 257 (D.D.C.1980). Instead of a monolithic litmus test, courts have considered several factors relevant to the determination of secondary meaning. *Id.* In the Second Circuit these factors include (1) advertising expenditures, (2) consumer studies linking the name to a source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Thompson Medical Co.*, 753 F.2d at 217.

"In assessing the existence of secondary meaning no 'single factor is determinative,' and every element need not be proved. Each case, therefore, must be resolved by reference to the relevant factual calculus." *Id.*, quoting in part *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

The calculus of facts in this case supports plaintiff's claim that its mark has attained secondary meaning.

Plaintiff has used the Marketing Week mark for its publication continuously since 1978, and exclusively until defendant first disseminated its re-titled magazine on September 8, 1986.

Since 1978 plaintiff has spent significant funds and energy advertising and promoting *Marketing Week* in the U.S. by regular sales trips to major U.S. advertising agencies and media owners. A senior director of plaintiff has made sales presentations in the U.S. at least twice annually for the last eight and one-half years. Plaintiff has also undertaken substantial direct mail marketing of the magazine in the U.S. In recent years *Marketing Week* has generated a minimum of $100,000 up to $250,000 annually in advertising revenues from U.S. advertisers.

Plaintiff also demonstrated significant unsolicited coverage of *Marketing Week* in the American press, including citations in

*The Wall Street Journal, Businessweek,* and defendant's own *Adweek* magazine.

Significantly, plaintiff established that defendant deliberately selected the Marketing Week name in bad faith; with full knowledge of plaintiff's exclusive use of the mark on its magazine in the United States and in the U.K. and Europe, and clear awareness of plaintiff's plans for continued expansion in the United States. Not only was defendant a subscriber to *Marketing Week,* but defendant was a party to serious business negotiations regarding Centaur's further penetration into the U.S. market. Despite defendant's insight and knowledge, it chose to design its publication with plaintiff's "Marketing Week" mark prominently displayed on the front cover.

■ A deliberate attempt to plagiarize the first user's mark is evidence that the mark has acquired secondary meaning. *Thompson Medical Co.,* 753 F.2d at 217. The Second Circuit has stated that "the second comer is under a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 953 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982) (citations omitted). A/S/M's knowing and deliberate appropriation of plaintiff's name convincingly supports the inference that the "Marketing Week" mark was well-known and associated by consumers with a high quality magazine from a particular source. *See Harlequin Enterprises, Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981) ("perhaps most significant evidence of secondary meaning" was deliberate attempt by defendant to capitalize on plaintiff's mark); *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 608 (S.D.N.Y.1979) ("Most per-

suasive, however, is the inference of secondary meaning that arises by virtue of defendant's own admission and the act of copying almost every detail of plaintiff's product.)[1]

Plaintiff conceded at the start of trial that its success in attracting American subscribers has been limited in number. However, *Marketing Week*'s very good reputation in top U.S. marketing and advertising circles was clearly established at trial. Many of those on *Marketing Week*'s 1985–86 list of U.S. subscribers are advertising firm vice-presidents, and marketing directors of significant American corporations.

In determining the existence of secondary meaning, "[t]he question is not whether the general public, but the *relevant buyer class* associates a name with a product or source." *American Assn. For Adv. of Science,* 498 F.Supp. at 257 (emphasis in original), *see also Parrot Jungle,* 512 F.Supp. at 268 (inquiry is whether mark attained secondary meaning "in its market".). Here, the "relevant buyer class" is consumers likely to purchase both magazines and thereby be confused as to the source of the products at issue: That is, members of the international marketing and advertising community, especially those with an interest or involvement in European and British markets.

■ Secondary meaning has been established when a mark has achieved substantial recognition within a distinct and relevant business community. *See Fund of Funds, Ltd. v. First American Fund of Funds,* 274 F.Supp. 517, 524 (S.D.N.Y.1967) (secondary meaning established where mark recognized among "members of the investment public or professional investment community."); *see also President & Trustees of Colby Colege v. Colby College-*

---

1. Some courts have concluded that intentional and direct copying *alone* is sufficient to carry plaintiff's burden of proving secondary meaning. *M. Kramer Mfg. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1986); *Scholl, Inc. v. Tops E.H.R. Corp.,* 185 U.S.P.Q. 754, 758 (E.D.N.Y.1975). The Second Circuit has made it clear that no single factor is conclusive, and that knowing copying is one among several factors to be evaluated when determining the existence of secondary meaning. *Thompson Medical Co.,* 753 F.2d at 217. Accordingly, this Court has been guided by a balancing of the evidence on the various relevant criteria.

*N.H.*, 508 F.2d 804, 808 (1st Cir.1975) (name of college established secondary meaning where recognized by "an appreciable number of individuals broadly associated with other institutions of higher education in a given geographic area.") *Merriam Co. v. Saalfield*, 198 F. 369, 373 (6th Cir.1912), *affd.* 238 F. 1, *cert. denied*, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917) (secondary meaning contemplates that name may have been used such that "in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was his product ...").[2]

The increasingly global nature of mass-communications as well as the multinational corporate and financial structure of the advertising industry make the international marketing and advertising community in America a highly cohesive and commercially relevant market. *Marketing Week* has established secondary meaning in the relevant market. The magazine has achieved substantial recognition and acceptance among executives in the international marketing and advertising community in the United States.

■ A plaintiff may be able to show secondary meaning when a highly important segment of purchasers in the market associates the mark as identifying the product as plaintiff's. "Secondary meaning only requires that a significant part of the consuming public has come to accept the name as the exclusive property right of the plaintiff." 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies*, § 19.26 at 86 (4th ed. 1986); *see Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1295 (S.D.N.Y.1972) (secondary meaning present where needlepoint manufacturer's name known to a "substantial number of present or prospective needlepoint purchasers.") The quantity of the circulation of a magazine is of diminished significance in finding secondary meaning

where, as here, no one else except plaintiff has been using the identifying mark.

Plaintiff has further buttressed its claim of secondary meaning by demonstrating *Marketing Week*'s substantial recognition and acceptance among the most influential executives in the upper echelons of the American international marketing and advertising community. The head of the prestigious American trade magazine, *Advertising Age*, with an enormous U.S. circulation, relies on *Marketing Week* as a source. The head of the largest advertising agency in the United States testified that he makes sure that his public relations office receives *Marketing Week* on a regular basis.

■ A survey is an acceptable method from which to appraise the existence of the secondary meaning of a trademark. It is, however, only one means and only one of the factors to be evaluated among all the facts and circumstances presented in evidence. The survey conducted by defendant is found factually to be of dubious value in the totality of the evidence. Although defendant's expert was of eminent distinction, there are flaws in and unacceptable aspects of the survey. The trustworthiness of a survey depends upon a demonstration by its proponent that "(1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the entire process was assured." *Toys "R" Us v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1205 (E.D.N.Y. 1983).

---

**2.** Courts also have taken special note where a product has achieved notoriety in a significant sector of a market. *See Ferrara v. Scharf*, 466 F.Supp. 125, 133 (S.D.N.Y.1979) (plaintiff's use of name for five years in the "bridge business" sector of the jewelry market was a factor which supported the finding of secondary meaning.)

Here, defendant improperly defined the universe for the survey as members of the American Marketing Association rather than members of the relevant market, executives from the international marketing and advertising community in the United States. In this gerrymandered universe, which is much larger than the relevant universe, defendant's finding that 22 percent of those surveyed recognized the mark "Marketing Week" (a mark which defendant does not claim as its own) actually tends to support, not negate, plaintiff's claim of secondary meaning.

There is also a strong indication that the sample was contaminated. In the four months preceding the survey defendant mailed directly to professional members of the American Marketing Association approximately 24,000 subscription solicitations with promotional literature. Lists of members of this Association were then used as the base from which those contacted in the survey was drawn. Additional evidence suggested that during this same time period as many as 250,000 solicitations may have been disseminated to the survey sample due to the potential presence of those interviewed on other mailing lists used by defendant.

These mailings were not revealed or known to the surveyor at the times the universe for the survey was selected, the survey was conducted, and his report was prepared.

■ In addition, the survey's probe question inappropriately suggested and framed the issue for interviewees, and was inaccurate from a legal standpoint.[3] There is also evidence that personal supervision by

defendant's expert was lacking in that there was a failure to reject incomplete or improperly recorded answers to the survey.

■ At trial, counsel for defendant made much of the fact that the survey indicated that zero percent of those interviewed identified *Marketing Week* as a *British* publication. While this figure is not surprising, based on defendant's misidentification and contamination of the survey market, even had the result been validly procured it would not control the question of secondary meaning. Secondary meaning does not require that consumers know the actual identity of the product's geographical source or the place where it was printed or published. "All that is necessary to establish secondary meaning is that the ordinary buyer associates the mark with a single source, regardless of what that source is.... [I]dentification of source merely means associating the mark with a single, anonymous source." 1 McCarthy, *supra*, § 15.2 at 664; *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 (S.D.N.Y.1972) ("anonymous producer" may acquire secondary meaning.)

■ Suffice it to say that based on evaluation of all evidence at trial, plaintiff has established secondary meaning.[4]

### B. *Likelihood of Confusion*

In addition to proving secondary meaning, to obtain relief under section 43(a) of the Lanham Act a plaintiff must establish that "there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply

---

**3.** A publication may attain secondary meaning even if consumers do not "read and rely" on it, contrary to the suggestion contained in the probe question. There are other flaws in the survey's form. The survey response form is suspect because on the question of whether the interviewee heard of *Marketing Week* the "no" response for the interviewer to check was located to the left and before the "yes" box. This reversal of accepted logical symmetry is susceptible of having confused interviewers, leaving open the possibility of mistakenly checking the wrong response and also permits a bias toward

producing the first and negative response which favors defendant's position in this case.

**4.** Plaintiff, in the alternative, argues that its mark should be protected as developing "secondary meaning in the making." *See Loctite Corp. v. National Starch & Chemical*, 516 F.Supp. 190, 210–211 (S.D.N.Y.1981); *National Lampoon, Inc. v. American Broadcasting Co., Inc.*, 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir.1974). The evidence thereon tends to further buttress the Court's finding that secondary meaning itself has been established.

confused, as to the source of the goods in question." *Thompson Medical Co.*, 753 F.2d at 213.

 Likelihood of confusion is determined by a balancing of the evidence on criteria that have become known as the *Polaroid* factors. These factors are (1) the strength of the mark or name, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood that the prior owner may bridge the gap, (5) any evidence of actual confusion, (6) the defendant's good or bad faith in using the mark, (7) the quality of defendant's product, and (8) the sophistication of the purchasers. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 448 (S.D.N.Y.1982); *Information Clearing House v. Find Magazine*, 492 F.Supp. 147, 154–55 (S.D.N.Y.1980).

 Defendant's intentional and deliberate use of the "Marketing Week" mark dominantly emblazoned on its magazine, with full and prior knowledge of plaintiff's publication provides strong if not conclusive evidence of the likelihood of confusion. "If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980). "[D]eliberate use of plaintiff's exact name unquestionably gives rise to a legal presumption that the similarity will cause consumer confusion." *Parrot Jungle*, 512 F.Supp. at 270, quoting *RJR Foods Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979).

In any event, as detailed in the Findings of Fact, comprehensive evaluation of each *Polaroid* factor leads to the inevitable conclusion that the "Marketing Week" mark, as it presently appears on defendant's magazine, is likely to mislead and confuse an appreciable number of ordinarily prudent purchasers.

**(1)** *The Strength of the Mark*

As a descriptive mark, "Marketing Week" cannot attain the comparable strength of a more fanciful or arbitrary mark. *See 20th Century Wear, Inc.*, 747 F.2d at 87. However, plaintiff's long, continuous and exclusive use of the mark for its magazine, the magazine's worldwide circulation of over 36,000, and the tendency of purchasers to associate the magazine as emanating from a particular source, establish that plaintiff's mark has achieved a position of relative strength.

**(2)** *The Degree of Similarity Between the Two Names*

Although defendant purports to use the name "Adweek's Marketing Week," it is clear to the Court that upon viewing the cover of defendant's publication, an ordinarily prudent purchaser would conclude that the name of the publication is "Marketing Week," the exact same name as plaintiff's publication. The reference to "Adweek" on the cover is obscured in diminished lettering, occupying a significantly and materially lesser percentage of the entire logo, leaving the prominent display of MARKETING WEEK indistinguishable from plaintiff's mark when looked at by an ordinary viewer. The initial cover announcing the change in the name of defendant's publication contains a sharply scaled down version of the logo in which a reader practically needs a magnifying glass to clearly perceive the word "Adweek's." Defendant's extensive solicitations for subscriptions to its newly-titled publication expressly referred to the magazine as MARKETING WEEK, and left out the prefix "Adweek's" in its entirety.

As used by the parties, the two names at issue attain the highest degree of similarity, and at are times identical.

**(3)** *The Proximity and Quality of the Products*

Not much need be said on the close proximity of the products at issue. Both products are magazines, both magazines are

published weekly and are of high quality, both contain news, information and features regarding the advertising and marketing industry, and both are aimed in extensive portions thereof at similar classes of consumers.

#### (4) *Bridging the Gap*

The likelihood of confusion is marginally diminished by the fact that, unlike defendant's publication, *Marketing Week*'s editorial content has a decided emphasis on British and European marketing. However, the evidence at trial established plaintiff's clear intention to publish an edition of the magazine with an American focus. Plaintiff has undertaken, and continues to conduct a vigorous search for an American partner with whom they could launch a full-scale American edition of *Marketing Week*. In fact, Centaur and A/S/M have discussed on several occasions well prior to this action the prospect of a partnership.

In addition, a New York Stock Exchange listed corporation has made a multi-million dollar equity investment in plaintiff with the express understanding that further penetration of the U.S. market was intended.

■■ The concept of "bridging the gap" accords respect to the "senior user's interest in preserving reasonable avenues of future expansion into related fields," while not allowing the senior user "to preclude others from entering unrelated markets into which it has no intention of entering." *Information Clearing House*, 492 F.Supp. at 159. A claim of infringement is strengthened by credible "evidence that plaintiff can, will, or intends to 'bridge the gap' between the publication it now offers for sale and those offered by defendants." *Id.* Plaintiff has presented just such evidence.

Significantly, *Marketing Week* has established its good reputation among an important segment of the relevant market, those upper echelon executives who are the industry's most influential decision makers. This significant recognition is likely to result in considerable consumer confusion if

Centaur achieves its plan to legitimately further penetrate and bridge the gap in the U.S. market.

#### (5) *Actual Confusion*

Recently articles appeared in *The New York Times* and *The Wall Street Journal* referring to "Marketing Week" magazine. Upon reading the articles, there is no way to know whose publication each article refers to. As demonstrated at trial, in actuality, one article was referring to plaintiff's publication while the other referred to defendant's.

Indeed, the learned surveyor testified regarding defendant's publication, "there is no doubt that people read this magazine and refer to it as *Marketing Week* and not as *ADWEEK's Marketing Week*." Considering the contamination discussed above, and the logo used by defendant, the surveyor's impression of confusion is highly indicative.

#### (6) *Bad Faith*

■■ There is a presumption of confusion where, as here, a second comer knowingly and intentionally copies and uses the mark of a senior user. *See Perfect Fit Industries*, 618 F.2d at 954. It is abundantly clear that defendant acted in bad faith when the name was chosen, and when it applied to the Patent Office and falsely stated in its application signed by its executive vice-president and principal stockholder that no other person or corporation has the right to use the mark "Marketing Week" in commerce, either in the identical form or in such near resemblance thereto as may be likely to "cause confusion, or to cause mistake, or to deceive."

#### (7) *Sophistication of the Buyers*

There is little doubt that executives in the marketing and advertising community are highly sophisticated consumers. However, even a highly sophisticated and discriminating class of consumers cannot be relied upon to allay confusion when the marks and products are nearly identical.

*See McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137–38 (2d Cir.1979); *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 638 F.Supp. 652, 657 (S.D.N.Y.1986).

Furthermore, defendant's executive vice-president himself called into question the sophistication of the buyers when he lamely testified that the primary reason that *Adweek's National Marketing Edition* was re-named *Adweek's Marketing Week* was because many readers were confused by the idea of having regional and national editions entitled *Adweek.*

In sum, plaintiff has established a high likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused as to the source of the magazines as currently marked.

## II. *State Law Claims*

■ Plaintiff has also carried its burden of proving common law unfair competition. "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labor and expenditures of another." *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). Relief is granted "where the defendant's conduct has involved a clear attempt to profit at the expense of the plaintiff." *Flexitized Inc. v. National Flexitized Corp.* 335 F.2d 774, 781 (2d Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); *see Perfect Fit Industries,* 618 F.2d at 953.

Defendant deliberately and knowingly misappropriated plaintiff's mark with the intention of erecting a barrier to plaintiff's further penetration of the U.S. market, and in a manner likely to create consumer confusion. The confusing newspaper articles in evidence illustrate that defendant's predatory conduct has plagued plaintiff with a loss of good will, and credit where it is due. Under New York law, defendant's willful attempt to profit at the expense of plaintiff would constitute unfair competition even if plaintiff had not established secondary meaning. *Harlequin Enterprises v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981) (secondary meaning not prerequisite to trademark protection under New

York law); *Perfect Fit Industries,* 618 F.2d at 952 (same); *Flexitized,* 335 F.2d at 781 (same); *Le Cordon Bleu v. Littlefield,* 518 F.Supp. 823, 827 (S.D.N.Y.1981) (same); *Loctite Corp. v. National Starch & Chemical,* 516 F.Supp. 190, 214 (S.D.N.Y.1981) (same).

Plaintiff has also established deceptive acts and practices by defendant in violation of New York G.B.L. § 349(a). *See Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y.1984) (deliberate and deceptive use of mark).

## *Conclusions and Relief*

■ Plaintiff has carried its burdens of proof under section 43(a) of the Lanham Act and New York law. Accordingly, a Decree enjoining defendant will issue. However, the highly descriptive nature of the "Marketing Week" name does not require the restraint of *all* forms of uses of those words by defendant in the future. Therefore, defendant will be enjoined from using in the sale or promotion of its publication, the mark "MARKETING WEEK" alone or in any manner likely to cause confusion with plaintiff's publication.

Defendant will be further and specifically restrained from displaying on the cover of any its publications, or in any solicitations for any publication, the mark "MARKETING WEEK" with the word "AD-WEEK'S" in the diminished lettering presently used by the defendant, or in a similar manner whereby it occupies a significantly or materially lesser percentage of the entire logo. *Cf. American Assn. For Adv. of Science v. Hearst Corp.,* 498 F.Supp. 244, 262–64 (D.D.C.1980) (permanently enjoining defendant's publication of *Science Digest* magazine "with the word 'Science' displayed to such predominance that the viewer is magnetized into perceiving it as the title.")

■ Finally, under both federal and state law the awarding of attorney's fees as additional costs against defendant and for the plaintiff is appropriate based on defendant's bad faith, deliberate and willful

infringement of plaintiff's mark. *See* 15 U.S.C.A. § 1117 (1986); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1025–26 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986) (attorneys' fees recoverable in "exceptional cases" where section 43(a) of the Lanham Act is violated.); *Yeshiva Univ. v. New England Educ. Institute,* 631 F.Supp. 146, 147 (S.D.N.Y.1986) (same); *Vuitton Et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071, 1079 (S.D.N.Y.1979) (awarding attorneys' fees in "exceptional case" under Lanham Act where plaintiff's conduct was "deliberate or willful."); *Vitabiotics, Inc. v. Krupka,* 606 F.Supp. 779, 786 (E.D.N.Y. 1984) (awarding attorneys' fees under state and federal law.)

A Decree accordingly will accompany this Opinion.[5]

**5.** Annexed hereto as Addenda are a copy of defendant's magazine cover in the form that it appeared up to one week before the September 8, 1986 revision; an announcement of the revised format of its cover; a copy of the cover used by defendant after the revision; and the cover used by plaintiff.

ADWEEK

Vol. XXVII No. 41 NATIONAL MARKETING EDITION September 1, 1986 ● $1.50

## Apple Team 'Ecstatic' With Power Steering In First BBDO Spots

### By Betsy Sharkey and Jon Berry

CUPERTINO, CALIF.—Power. That's the image of the new Apple Computer being shaped by chairman John Sculley.

A first glimpse at the extensive package of new advertising will come during Apple's dealer meeting this week in Boca Raton, Fla. It represents BBDO's first work since winning the account after a highly charged review with Chiat/Day earlier this year. And sources say tension has been running high at the agency, which *(Continued on page 3)*

## Clients Catching Risen Stars In Search for Ad Creativity

### By Stephen Battaglio

NEW YORK—Discontent over advertising's merger mania could spur a backlash among some clients toward smaller shops built around dominant creative personalities.

The decision by Quaker Oats Co. last week to shift $20 million of its business from BBDO to Jordan, Manning, Case, Taylor & McGrath was prompted in part by the mid-sized agency's addition of

creative star Burt Manning, former ceo of J. Walter Thompson USA. The success of big-agency refugees Hal Riney and Roy Grace also points up the emerging alternatives to huge agencies that believe clients increasingly will want more of everything, from sales promotion services to international networks.

Some clients believe, however, that the piling up of resources can stifle creative drive and yearn for the days *(Continued on page 6)*

Throwing its weight around

**A Breed Apart?**
The Merrill Lynch bull is back. But ADWEEK "Critique" columnist Barbara Lippert wonders if the sort of fanfare Bozell, Jacobs, Kenyon & Eckhardt used for Chrysler will work this time. *(See page 21)*

(INDEX CONTINUED ON PAGE 2)

## Yago Going Up Against Coolers

### By Nancy Youman

NEW YORK—Yago Sant'Gria's heyday went out with Flower Power. Its wine cooler cousins, however, are just coming of age, and Yago is ready for another go 'round.

Now, with new ads and wider distribution for its new aseptic packaging in Chicago, Boston and Norfolk, Va., Yago is taking on coolers.

Yago was a cooler before anyone, including its parent, Monsieur Henri Wines Ltd., knew what a cooler was. The way Ed Minning, president of Monsieur H_____ __ _____ __s-try has cau__ ___

At its pe___ ___ ___ *6)*

PLAINTIFF'S
EXHIBIT
7

## Heileman: Small Is Beautiful

### By Fran Brock

LA CROSSE, WIS.—Searching for an untapped segment of the beer market is as chancy as drilling for oil. But G. Heileman Brewing Co. thinks it will strike it rich when it pops the spigot on its European-style specialty beers Friday at the company's new state-of-the-art Milwaukee brewery.

The new Val Blatz Brewery will reintroduce draft beers first brewed by Valentin Blatz, the innovative beermaker who put Milwaukee on the map as beer capital of the U.S. 135 years ago.

U.S. brewers *(Continued on page 4)*

# ADWEEK

Dear Reader:

We've changed the name of our National Marketing Edition to reflect ADWEEK's commitment to professionals interested in the marketing of consumer products and services.

Now it's:

...with its own distinctive look.

Here's what we are up to. A little over a year ago, we introduced our National Marketing Edition because ADWEEK realized that advertisers and marketers have very different interests from advertising agency executives. Marketers need to know about things like research techniques, changing audiences, innovative new products and shifts in marketing strategies. The National Marketing Edition gave marketers all this and more while keeping ADWEEK's unique coverage of creativity and creative people. The response was most gratifying. Circulation surpassed our expectations and we realized that this new audience was very special indeed.

So, to set it apart from ADWEEK's six regional editions edited for agency/advertising executives, we've now given the National Marketing Edition a new look. And a new name, ADWEEK's MARKETING WEEK.

It's another step in the evolution of a magazine changing and growing to fit the needs of its readers.

Joshua Levine,
Editor
ADWEEK's MARKETING WEEK

1118

# ADWEEK'S MARKETING WEEK

Vol. XXVII No. 42 NATIONAL MARKETING EDITION September 8, 1986 ● $3.00

# Hands Across the Supermarket: Scott Banks On Charity Tie-In

### By Stephen Battaglio

NEW YORK—If Scott Paper Co. has its way, the phrase, "I gave at the office," will be replaced by, "I gave at the supermarket."

The Philadelphia-based paper products manufacturer is evaluating its Helping Hand line of household products to determine whether charity alone can serve as a product's positioning.

For each Helping Hand item sold, Scott donates a nickel to six national health agencies that assist children. All the products are being advertised together in print, radio and TV ads with the theme, "Everytime you buy, you help," which broke *(Continued on page 6)*

# Nets Gain Ground In Sports Ad Sales

### By Gail Belsky

NEW YORK—Even before the first yard was gained in the regular NFL season's opening games Sunday, CBS reportedly had sold about 30% of its Super Bowl inventory at the not-so-firm rate of $600,000 per 30-second unit.

Buyers partly attribute the recent upturn in the overall sports market to that network's wheel-and-deal Super Bowl *(Continued on page 8)*

**The 1986 Fall Preview**
It was a whirlwind mega-merger summer, but there's still more excitement to come. We tell you what's on the way in advertising, marketing, movies, TV, fashion and much more. *(See page 40)*

(INDEX CONTINUED ON PAGE 2)

# AMC Heads for the Red With 0% Rate

### By Ralph Gray

SOUTHFIELD, MICH.—What profiteth it a car company to sell off its whole inventory and lose its shirt?

For American Motors Corp., perhaps enough breathing room to hold out until it can market snazzier new models next year. The price is a deeper dive into the red now.

AMC opened a promotional act without an encore last week: a 0% financing rate designed to help it clear out its bloated *(Continued on page 4)*

# Flavored Vodkas Spice Up Market

### By Nancy Youman

NEW YORK—Something old is new again: flavored vodkas.

Popular for centuries in Russia, where the flavor of pepper, herbs and berries masked the sour taste of crudely distilled grog, several marketers are betting that what played in Pinsk will play in the Polo Lounge.

Pertsovka, a pepper-flavored vodka made by Stolichnaya and imported from Russia by Monsieur Henri

Wines Ltd., White Plains, N.Y., started getting its first advertising support this summer. At around the same time, Pertsovka, which has been available here for 15 years, met its first competitor with the introduction of Carillon Importers' Absolut Pepar. Absolut knocked Stolichnaya out of first place in vodka *(Continued on page 4)*

1119

# MARKETING WEEK

**SEPTEMBER 5, 1986 90p VOLUME 9 No. 28**

PLAINTIFF'S MAGAZINE

# CAN PCs PUT SUGAR ON TOP?

PLAINTIFF'S
EXHIBIT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Centaur Communications, Limited, ("Centaur") is a corporation organized under the laws of Great Britain, having its principal place of business in London, England. Centaur is an established British publisher of a family of periodicals, including *Marketing Week* magazine. Its other publications are *Money Marketing* magazine, *Creative Review* magazine, *Televisual* magazine, *International Marketing Review* magazine, *Marketeer* magazine, *Design Week* magazine, *Your Business* magazine. Centaur is involved also in video publishing, conference organization, and language learning systems.

2. A/S/M Communications, Inc. ("A/S/M") is a corporation organized under the laws of the State of New York, with its principal place of business at 49 East 21st Street, New York, NY 10010. A/S/M is an established American publisher of magazines, including the six regional editions of *ADWEEK* magazine, and the periodical it purports to call *ADWEEK'S Marketing Week* magazine.

3. In 1978, Marketing Week Communications launched the British publication *Marketing Week* magazine. In July 1982, Centaur, the plaintiff herein, acquired all the equity in Marketing Week Communications.

4. *Marketing Week* magazine is a weekly publication, which, from its inception, has been distributed worldwide. Its circulation has been principally in the United Kingdom and Europe, but since inception, has also been distributed in the United States. Its average worldwide circulation in the first half of 1986 was 36,189. It had, in the United States, in the 1985–86 period, 194 subscribers in the advertising and marketing community, of whom 40 received the magazine free of charge; a number are in the renewal cycle and have not yet renewed. Intra-company mails of multinational corporations accounted for additional copies going to America.

5. The magazine is directed principally toward marketing management, including their counterparts at advertising agencies in the United Kingdom, and contains information about marketing in the United Kingdom, Europe, and the United States. It contains a weekly section devoted to American news. In the United States it is directed to executives and others involved in international marketing and advertising, and those with a special interest in European and British marketing.

6. The trend in marketing is toward globalization. The exchange of ideas, products, and business executives among international markets generally is at an all-time high, and the trend is expected to continue and progress. In the American and British marketing industries specifically, events over the last 12–18 months indicate that convergence is taking place. Consumer brands these days are being marketed around the world, in some cases with a thought of a global marketing approach to them so that the advertising and marketing business goes way beyond the borders of any one country. A considerable number of UK advertising agencies, or UK communications companies, have recently taken over USA agencies. In addition, a number of British and American agencies have merged, and almost all of the major advertising agencies, such as Young & Rubicam, Mc-Cann-Erickson, and J. Walter Thompson, have offices in both the USA and the UK. An American company marketing in the UK needs to know about the British marketing environment. It needs to know about competitive products and how they are being marketed. It also needs to determine—based on knowledge of the marketing environment—how it will market its product. The upper echelons of the American marketing community know of, and rely on, plaintiff's *Marketing Week*. The defendant purchased, for distribution, 6,000 copies of an issue titled *Marketing Europe* replete with references to *Marketing Week*, to furnish their subscribers with information on how to market in Europe. It distributed a substantial number of those copies.

7. American consumers, educators, and experts associate *Marketing Week* with plaintiff's UK publication.

8. Defendant began publishing its magazine in 1985, entitled *ADWEEK*. Prior to September 1986, it published seven different regional editions, six of which were titled *ADWEEK* in letters printed about two inches high by one inch wide. The seventh was also labeled in the same prominent lettering style, and below the title, was printed, in lettering one-eighth inch by one-eighth inch, the name of the edition, i.e., *National Marketing Edition*. On September 8, 1986, defendant radically changed the name of this publication to *Marketing Week*, printed in letters one-and-a-half inches by one inch, in print style similar to, and virtually identical to, the size of the lettering used in plaintiff's publication. Above the bold lettering of *Marketing Week* in the defendant's publication, and in relative obscurity in three-sixteenths-inch-high letters, the word *ADWEEK'S* was printed, standing by itself. In promotional literature and solicitations for subscribers, A/S/M has referred to its magazine as *Marketing Week* or, in the alternative, as ADWEEK'S *Marketing Week*. There is thus an identical resemblance between the questioned mark of the defendant and the plaintiff's mark, *Marketing Week*.

9. The editorial content of plaintiff's *Marketing Week* is divided into two sections. The first section, the news section, tends to be time-sensitive. The period during which the information provided remains relevant to the reader is relatively short. The second section, the features section, is less time-sensitive. Because marketing techniques can be transferred from one country to another, the features section is especially useful to *Marketing Week* magazine's non-British readers.

10. *Marketing Week* produces surveys of the European market twice each year. The reference material is used by United States companies and media planners at United States advertising agencies when they are formulating their marketing plans for the United Kingdom or Europe.

11. Centaur's *Marketing Week* magazine is read by many executives in the advertising and marketing fields in the United States. The magazine is well known and well respected by those in the advertising and marketing community, both in Great Britain and in the United States. It is the flagship magazine among Centaur's publications and other business endeavors. Promotion for other Centaur magazines has included statements intended to benefit from *Marketing Week* magazine's goodwill, such as "From the people who bring you *Marketing Week*." From May 1980 to June 1985, the cover of *Creative Review* magazine stated that it was "Published by *Marketing Week*." *Creative Review* magazine now has a circulation in the United States of about 900. The second page of *International Marketing Review* magazine states that "The publisher of *International Marketing Review* is Centaur Communications, Ltd., who also publish *Marketing Week* and other leading marketing and advertising magazines in Britain." *International Marketing Review* magazine has a circulation of several hundred in the United States.

12. Centaur, under the *Marketing Week* banner, has sponsored, or co-sponsored, several international conferences and seminars on marketing and advertising, at which prominent and respected American businessmen have been included, such as the President of Heinz, the President of Remington; the Marketing Director of Ralston-Purina; the President, Chief Executive Officer, and Deputy Editor-in-Chief of *Forbes* magazine, and the Manager of Advertising & States Promotion of Texaco. Many of the principal companies represented at, or participating in, these conferences have included Ogilvy & Mather, Coca Cola, Colgate Palmolive, American Express, American Newspaper Advertising Bureau, Dunlop, Estee Lauder, Franklin Mint, General Electric, Goodyear, Hewlett Packard, Honeywell, IBM, Nabisco, Parker Bros., Polaroid, Wang, *Forbes* magazine, Chase Manhattan Bank, Johnson Wax, Texaco,

Heinz, Kelloggs, Mars, Max Factor, and Revlon. Centaur has produced videoguides to advertising agencies, sales promotion, public relations, and creative services. These products are marketed under the *Marketing Week* "banner." More than one-third of the ad agencies in the guide are American.

13. Plaintiff's *Marketing Week* is used as a reference in both this country and the UK. It has been cited by such news organizations as The Associated Press, *Businessweek, The Wall Street Journal, The Economist, The Financial Times,* and A/S/M's own *ADWEEK* magazine. The contents of the magazine can also be found on a number of computer data bases available in the United States and the UK. The magazine is recognized by those in the business information industries as an authoritative source of marketing information.

14. American advertisers include *Business Week, Newsweek, Forbes, Fortune, The Wall Street Journal, The New York Times,* Continental Airlines, *Playboy, Scientific-American,* McGraw Hill, Hilton International, Inc., *USA Today, Time,* and *National Geographic.* Current annual advertising revenue from American customers ranges from a hundred thousand dollars to a quarter of a million dollars.

15. In August 1985, Centaur undertook a USA subscription mailing to 26,000 people, using the subscription list of the American magazine *Advertising Age.* The cost of this mailing was about $10,000. Centaur promotes subscriptions by direct mailing subscription brochures to the top 100 advertising agencies in the United States, as well as some of the large United States corporations, and these mailings have been made at least once in each of the last three years.

16. *Marketing Week* is well known among advertising management involved in international advertising, and is well known in the United States among those in business who must know about international marketing, and especially about marketing in the UK.

17. Centaur intends to expand *Marketing Week*'s presence in the United States; American investors include the Culbro Corporation. The latter, a New York Stock Exchange listed corporation, purchased an equity interest in Centaur in 1985, and has invested $5,000,000 therein. American interests now own 30% of Centaur.

18. Centaur's distribution of *Marketing Week* in the United States is part of an ongoing program to distribute the mark in the United States. It plans to increase its distribution of *Marketing Week* in the United States in order to further exploit this lucrative market. As a result of its efforts, both inside and outside the United States, Centaur's *Marketing Week* magazine has achieved secondary meaning in the United States.

19. A/S/M has long been aware of Centaur and its *Marketing Week* magazine. In 1982, the defendant and plaintiff engaged in negotiations which, if successful, would have led to Centaur's purchase of a substantial block of the defendant's shares, and would have provided Centaur with the partner it has sought to expand its American market for its *Marketing Week* magazine. Between November 1982 and March 1984, a senior *ADWEEK* magazine editor wrote a column for Centaur's *Marketing Week,* with defendant's knowledge and permission. In 1985, defendant and plaintiff were partners in the publication *Marketing Europe 1985.* Defendant's *ADWEEK* has cited plaintiff's *Marketing Week* magazine, has published a 1500 word article by a writer for plaintiff's *Marketing Week* magazine, and has a subscription to plaintiff's *Marketing Week* magazine. Thus, defendant's selection of the "Marketing Week" name was a knowing and deliberate appropriation of Centaur's mark.

20. Defendant never sought legal advice regarding the propriety of appropriating Centaur's "Marketing Week" mark; it made no trademark search.

21. A/S/M claims that it changed the name of its magazine from "National Marketing Edition" to "ADWEEK'S Marketing

Week" and that it derived the new name, "Marketing Week," from the former name, "National Marketing Edition." It claims that the new name evolved thusly: That "marketing" was already in its title, that it was a weekly publication, and that "week" already appeared in the name "ADWEEK." Because these elements existed, it claims it derived the name "ADWEEK'S Marketing Week" from "National Marketing Edition."

22. The title of the defendant's magazine was not originally "National Marketing Edition." The title was "ADWEEK" in bold two-inch letters across the front of the cover. Defendant did not change the title from "National Marketing Edition" and that remains on the cover of its magazine beneath the title in the same format and size.

23. Defendant did not derive the title "Marketing Week" from its former title, and its explanation concerning its adoption of the mark *Marketing Week* is not worthy of belief.

24. The September 8, 1986 issue of defendant's magazine was the first issue to use the title "Marketing Week." On October 1, 1986, defendant received a letter from plaintiff's counsel stating that defendant was infringing the Centaur mark. On the same day as the letter came to his attention, the defendant's Executive Vice President, after telephoning to trademark counsel, applied for federal registration of the marks "Marketing Week" and "ADWEEK'S Marketing Week." In the applications therefor, the said Executive Vice President represented that "to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive;". This, to the knowledge of said Vice President, was untrue. The next issue of defendant's *Marketing Week* magazine, the October 6th issue, bore a TM following the "Marketing Week" title for the first time. Defendant's counsel did not formally respond to the letter of October 1 until October 15. On January 6, 1987, the Patent and Trademark Office refused registration of A/S/M's "Marketing Week" mark on the ground that it was descriptive.

25. Centaur's previous discussions with A/S/M concerning the possible purchase of A/S/M stock by Centaur, as well as A/S/M's filing for trademark registration the day after it was notified of the infringement by Centaur, support an inference that A/S/M selected the Centaur mark "Marketing Week" in bad faith in order to exclude Centaur from the American market.

26. In addition to the tendency to create confusion of source by the use of defendant's logo, instances of actual confusion of source have unwittingly occurred. For example, in an October 8, 1986 article, *The Wall Street Journal* stated, "The trade magazine *Marketing Week* puts (Young & Rubicam's) net gain at 236.5 million, but Young & Rubicam say that number only counts its New York office." No other reference as to the source of *Marketing Week* magazine was given, and in that case the magazine was Centaur's. On November 14, 1986, *The New York Times* stated "According to the latest edition of the magazine *Marketing Week*, Gillette's attractiveness may be enhanced by its global strength." No other reference as to the source of *Marketing Week* magazine was given, and in that case the magazine was A/S/M's.

27. The reference to *ADWEEK'S* in defendant's logo is either submerged and obscured in tiny print (or even omitted) so as to be not noticeable to the ordinary viewer and leaves the prominent display of MARKETING WEEK indistinguishable from plaintiff's well established mark as viewed by an ordinary viewer, representing a clearly contrived purpose of the defendant to create confusion of source.

28. Plaintiff has established factually, by ample reliable evidence which is credited, both oral and documentary, a sufficient secondary meaning for its mark, MARKETING WEEK, in the relevant market in the United States. Defendant is clearly

guilty of deliberate and unfair competition in that market under New York law, as well as under the Lanham Act.

29. The issues of credibility in respect of the fact issues are resolved in favor of the plaintiff and against the defendant.

30. The survey made by the defendant is only one of the factors to be evaluated, and is found factually to be of minor value under all of the facts and circumstances.

31. There are many flaws in and unacceptable aspects of the survey of the defendant as promulgated and conducted and reported, including a strong indication of contamination of the taking thereof by the defendant's written solicitations of the professional members of the American Marketing Association within a few months preceding the use of the lists of those members as the base from whom those surveyed was drawn and the survey was conducted. Those solicitations were not disclosed by the defendant to the surveyor before the project was undertaken by him.

32. The Preliminary Decision, dated January 14, 1987, filed herein, is incorporated herewith in all respects, including the Appendix setting forth copies of the cover pages of the offending magazine.

## CONCLUSIONS

1. The Court has jurisdiction over the subject matter and the parties to this action and venue properly lies in this District.

2. Centaur's mark "Marketing Week" is descriptive and has acquired secondary meaning in the United States, and Centaur accordingly has a valid trademark entitled to protection in the United States.

3. Defendant infringed on plaintiff's trademark in bad faith, and knowingly, and copied plaintiff's mark with the realization that it had a secondary meaning that was in existence.

4. Centaur's distribution of its *Marketing Week* magazine in the United States is part of an ongoing program to exploit the mark commercially, and Centaur's usage of the mark in the United States is according-ly sufficient to maintain its trademark rights.

5. Centaur is entitled to injunctive relief, since the defendant's infringement on that mark will result in the likelihood of confusion as to the source of the product.

6. In instances such as those here, the predatory conduct of the defendant, coupled with the likelihood of confusion due to the same mark, is sufficient to establish a cause of action under New York law for unfair competition without a full showing of secondary meaning. The defendant deliberately appropriated the exact same title, and is misappropriating the goodwill which plaintiff has developed in its "Marketing Week" trademark.

7. A/S/M should be adjudged to have infringed Centaur's "Marketing Week" trademark, competed unfairly with Centaur, engaged in unfair and deceptive business acts and practices, and used false descriptions, designations of origin and representations about its product, all in violation of federal and state law.

8. Centaur is entitled to injunctive relief against the defendant under New York law of unfair competition as well as under § 43(a) of the Lanham Act. The decree to be entered herein shall restrain defendant from displaying on the cover of its publication, or in any solicitations, either the mark MARKETING WEEK with the word ADWEEK'S in the diminutive lettering as it now appears, namely, occupying a significantly and materially lesser percentage of the entire logo, or the mark, MARKETING WEEK.

9. A/S/M and its respective officers, agents, servants, employees, and all persons acting or claiming to act on its behalf or under its direction or authority, and all persons acting or claiming to act in concert or in participation with it or any of them, should be permanently enjoined and restrained from using on, or in connection with, the publishing, printing, mailing, distribution, offer, sale, offer for sale, advertisement or promotion of any magazine using the title "Marketing Week" or anything confusingly similar thereto, unless such uses have been licensed by Centaur.

10. Immediately following the entry of final judgment for Centaur, A/S/M should be required to publish a notice of prominent size in the next three issues of its magazine explaining why it has ceased to use the title "Marketing Week," with the deliberate minimization of the word AD-WEEK'S, and stating that its magazine is not connected in any way with *Marketing Week* magazine published by Centaur.

11. The Court will retain jurisdiction herein to determine whether any change in the defendant's logo corrects the infringement found to exist herein, and for the purposes of interpretation, enforcement or modification of the decree to be entered.

12. Costs and disbursements shall be taxed by the Clerk, and attorneys' fees to be fixed upon application to the Court, on notice, shall be entered at the foot of the decree as additional costs due plaintiff for infringement in an exceptional case.

13. The foregoing, together with the findings and conclusions entered herein on January 14, 1987, shall constitute the findings and conclusions required by Rule 52(a) Fed.R.Civ.P.

### DECREE

This action came on for trial before the Court, Honorable Milton Pollack, Senior District Judge, presiding, and the issue of liability having been duly tried and plaintiff having waived damages, and a preliminary decision consisting of findings of fact and conclusions, dated January 14, 1987, and a Decision in more detail, dated January 22, 1987, having been duly rendered, it is

ORDERED, ADJUDGED AND DE-CREED:

1. The Court has jurisdiction over the subject matter and the parties to this action and venue properly lies in this District.

2. Centaur's mark "Marketing Week" is descriptive and has acquired secondary meaning in the United States, and Centaur accordingly has a valid protected trademark in the United States.

3. Defendant infringed on plaintiff's trademark in bad faith, and knowingly, and copied plaintiff's mark with the realization that it had a secondary meaning that was in existence.

4. Centaur's distribution of its *Marketing Week* magazine in the United States is part of an ongoing program to exploit the mark commercially, and Centaur's usage of the mark in the United States is accordingly sufficient to maintain its trademark rights.

5. The defendant's infringement on plaintiff's mark will result in the likelihood of confusion as to the source of the product.

6. The defendant deliberately appropriated the exact same title, and is misappropriating the goodwill which plaintiff has developed in its "Marketing Week" trademark. The predatory conduct of the defendant, coupled with the likelihood of confusion due to the same mark, is sufficient to establish a cause of action under New York law for unfair competition without a full showing of secondary meaning.

7. A/S/M has infringed upon Centaur's "Marketing Week" trademark, competed unfairly with Centaur, engaged in unfair and deceptive business acts and practices, and used false descriptions, designations of origin and representations about its product, all in violation of federal and state law.

8. The defendant is restrained from displaying on the cover of its publication, or in any solicitations, either the mark MARKETING WEEK with the word AD-WEEK'S in the diminished lettering as it now appears, namely, occupying a significantly and materially lesser percentage of the entire logo, or the mark, MARKETING WEEK.

9. A/S/M and its respective officers, agents, servants, employees, and all persons acting or claiming to act on its behalf or under its direction or authority, and all persons acting or claiming to act in concert or in participation with it or any of them, are permanently enjoined and restrained from using on, or in connection with, the publishing, printing, mailing, distribution, offer, sale, offer for sale, advertisement or promotion of any magazine using the title

"Marketing Week" or anything confusingly similar thereto, unless such uses have been licensed by Centaur.

10. Immediately following the entry of this Decree, A/S/M is required to publish a notice of prominent size in the next three issues of its magazine explaining why it has ceased to use the title "Marketing Week," with the deliberate minimization of the word ADWEEK'S, and stating that its magazine is not connected in any way with *Marketing Week* magazine published by Centaur.

11. The Court retains jurisdiction herein to determine whether any change in the defendant's logo corrects the infringement found to exist herein, and for the purposes of interpretation, enforcement or modification of this Decree.

12. Costs and disbursements shall be taxed by the Clerk, and attorneys' fees to be fixed upon application to the Court, on notice, shall be entered at the foot of this Decree as additional costs for infringement in an exceptional case.

This Decree shall become effective five (5) business days after the date hereof, regardless of the date of the taxations of costs as provided in paragraph 12 above.